IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| JONATHAN SAVOY, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. AW-09-788 |
| CHARLES COUNTY PUBLIC SCHOOLS, *et al.*, | * | |
| Defendants. | * | |

*******************************************************************************

**<u>MEMORANDUM OPINION</u>**

On March 27, 2009, Plaintiff Jonathan Savoy, by and through his mother, Shanna Savoy, brought this case against Defendants Charles County Public Schools ("CCPS"), Justin Aglio, and Robert Pascarella, asserting various claims under federal and state law arising from a series of alleged disciplinary events. The matters currently before the Court are motions for summary judgment filed by Defendants Aglio, Doc. No. 63, and Pascarella, Doc. No. 58. The Court has reviewed the entire record with respect to the instant motions and finds that no hearing is necessary. *See* Loc. R. 105(6) (D. Md. 2010). For the reasons stated below, the Court will grant both motions as to Plaintiff's federal claims and dismiss the state claims without prejudice to Plaintiff's right to re-file in the Maryland state court system.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The following factual summary consists of undisputed facts and Plaintiff's version of the disputed facts, except when otherwise noted. Savoy, thirteen years old at the time, attended an alternative school within the CCPS system called the Robert D. Stethem Educational Center ("Stethem"). On March 30, 2006, Savoy was scheduled to return to Stethem after completing a

several-day suspension.  School policy requires that a parent be present to readmit the student to the school upon returning from suspension.  Anticipating that work-related reasons would prevent her from coming to Stethem to readmit Savoy until later in the day, Savoy's mother called Pascarella to make an accommodation.  He agreed that Savoy could come to school without her on the morning bus, wait for her in a designated room (referred to as the "return and reflect" or "R&R" room), and be readmitted upon her arrival.

In his deposition, Savoy explains that, while waiting for his mother in the R&R room, he was given some worksheets to complete by a teacher, Mr. Carrington.  Instead, he put his head on the desk and fell asleep.  He asserts that Aglio woke him up by hitting him, a single time, on the back of the head. Savoy's testimony is somewhat unclear as to how forcefully Aglio hit him, but two hints can be identified.  On the one hand, he testifies that Aglio hit him "hard enough to make my head move."  Doc. No. 71, Ex. 7 at 47: 6-7 (hereinafter "Savoy Dep.").[1]  However, when asked whether the hit made his head hurt, he replied, "[n]o.  I already had a little migraine."  *Id.* at 47: 10.  According to Savoy, the force of the hit by Aglio merely "made my headache a little worse."  *Id.* at 48: 18.

Savoy asked why Aglio had struck him.  Aglio responded that Savoy was not supposed to be in school.  Savoy explained that his mother had talked to Pascarella and was coming to readmit him later in the day.  Aglio instructed Savoy to come with him to Pascarella's office, and he gripped Savoy's arm to lead him in that direction.  When asked during his deposition if Aglio's grip on his arm hurt, Savoy responded that "[i]t didn't hurt like I'm going to cry about it.  I could feel he had a little grip on it."  *Id.* at 52: 2-3.

---

[1] Exhibit 7 to Plaintiff's opposition memorandum is not a complete transcript of Savoy's deposition.  Other portions are attached as Exhibit 9 to Pascarella's motion for summary judgment.  *See* Doc. No. 58, Ex. 9.  All references in this opinion to Savoy's deposition can be located in one of these two exhibits.

On the way to the office, Aglio called Pascarella on a walkie-talkie to inform him that he had a student who was not supposed to be in school. He asked Pascarella to meet them in the hallway. Pascarella promptly found them and began to have a conversation with Aglio. Aglio asked Pascarella whether he had spoken with Savoy's mother. Pascarella confirmed that he had spoken with her. Savoy testifies that he does not remember the remainder of their conversation. The next thing he remembers is that, while Aglio and Pascarella were in the midst of their conversation, he "jerk[ed] my arm away" from Aglio. *Id.* at 54: 14-15. Savoy claims that Aglio then "picked me up off the ground and slammed me towards the wall." *Id.* at 56: 2-3. Specifically, Aglio grabbed Savoy's shirt, near his chest and armpit areas, and pushed Savoy's back against a wall. Consequently, the back of Savoy's head hit the wall. Savoy's deposition does not describe how forcefully Aglio pushed him against the wall or how badly his head hurt as a result of the incident.

Aglio and Pascarella then grabbed him and carried him down the hallway to Dr. Watson's office. During his deposition, he was asked by counsel to describe, "the best you can recall, how Mr. Pascarella grabbed you." *Id.* at 58: 18-19. He explained in response that Pascarella held his arms and Aglio held his legs, such that his feet were not touching the ground. Beyond this, however, he "can't remember . . . how [Pascarella] grabbed me." *Id.* at 58: 21 to 59: 1.

At some point during these events, Savoy began crying, yelling, and cursing at Aglio and Pascarella. Defendants maintain that Savoy became agitated, loud, and threatening before they sought to restrain him, and that Savoy's behavior threatened to disrupt nearby classrooms. Savoy states that he began crying when his head hit the wall, and that he only started yelling "[p]robably like ten seconds after [he] started crying." Savoy Dep. at 65: 7-8. Savoy

acknowledges that he directed curse words at Aglio and Pascarella: "I was telling them to get the F off of me. I probably said a lot to them. *Id.* at 118: 15-16. According to Defendants, Savoy also threatened to "uppercut" them, Doc. No. 63, Ex. C at 7, and he aggressively bumped into Pascarella. However, Savoy denies both of these assertions.

Dr. Watson was in her office when they arrived. Aglio and Pascarella told her that they needed to use the office, and she walked out. Savoy testifies that Aglio and Pascarella locked the door to the office, carried him into the room and forced him to sit down in a chair. To use Savoy's words, they "tr[ied] to make me sit down" and they "kind of like threw me down." Savoy Dep. at 67: 13-14. He tried to get up from the chair several times, but Aglio and Pascarella forced him to remain seated. On one attempt to stand up, Aglio "threw [him] back down and the chair broke." *Id.* at 67: 15.[2] As a result, Savoy fell to the floor and hit his head again.

Dr. Watson returned to the office around that time. Aglio and Pascarella left, locking the door behind them. Savoy was angry and crying, and Dr. Watson tried to calm him down and asked if there was anybody he would like her to call. She called his sister, also a Stethem student at the time, who promptly came to Dr. Watson's office and helped Savoy calm down. Later that day, Savoy was picked up from school by his aunt. The Charles County Sheriff's office investigated the incident, and Stethem ultimately suspended Savoy for his behavior.

Savoy's deposition testimony does not say whether he experienced severe pain when he fell onto the floor after the chair broke. He does not recall complaining about head pain to anyone during his time in Dr. Watson's office. He does not remember having any cuts on his

---

[2] The sentence just quoted says that "they" threw Savoy down, which suggests that both Aglio and Pascarella took part in the act. However, Savoy later clarifies that Aglio was solely responsible for throwing him onto the chair and making the chair break.

4

head from the incident. Neither Savoy's sister nor his aunt noticed any visible signs of physical damage to Savoy's head when they saw him after the incident.

When Savoy's mother took him to Civista Health, Inc. ("Civista") for a medical examination later on that day, the medical staff concluded that Savoy had experienced "a minor head injury that does not appear serious right now." Doc. No. 71, Ex. 1 at 000003.[3] Two days later, on April 1, he received follow-up care at Civista and was given an instruction labeled "Contusion (Bruise)" and was told to take Ibuprofen every six hours. *Id.* at 000004-000006. The following day, Civista performed a CT Scan, which revealed "no significant abnormality." *Id.* at 000007 (capitalization omitted). The CT report did note, however, that Plaintiff presented with symptoms of "nausea, dizziness, [and] pain on [l]eft side." *Id.*[4]

On April 3, the following day, Savoy's mother took him to Children's National Medical Center ("CNMC") for further treatment. The records from the CNMC visit indicate that Savoy reported symptoms of nausea, vomiting, dizziness, and headaches that made eating and drinking difficult. Based on these symptoms, the examining physician diagnosed Savoy with a concussion and instructed him to take adult doses of Tylenol.

Savoy claims that since his concussion, he "get[s] a lot of . . . migraines and bad headaches," some of which require hospital treatment. Savoy Dep. at 134: 9-10. Savoy acknowledges that he suffered intermittent migraines prior to the alleged assault by Aglio and Pascarella; indeed, he claims that he had a migraine the morning of March 30, before Aglio hit him in the R&R room. Nevertheless, he maintains that after March 30, his migraines and

---

[3] Defendants challenge the admissibility of Plaintiff's medical records. However, because the Court ultimately holds that Plaintiff's federal claims must be dismissed even if all of his medical records were admitted, it is unnecessary to resolve the Parties' evidentiary disputes.
[4] One of Plaintiff's exhibits is a Civista record indicating that the Dr. Shannon Zimmerman reviewed several medical instructions with Savoy, including an instruction on contusions (bruising) and another on concussions. However, the date listed on that record is May 10, over one month after the March 30 incident, and Plaintiff omits portions of his medical records from the visit that make clear that it arose out of a completely different event: he had been hit in the head with a rock. *See* Doc. No. 75, Ex. 2.

5

headaches became more frequent: as of his deposition on September 2, 2010, he would get about two or three migraines per month.

On March 27, 2009, Savoy, by and through his mother, brought this case against Pascarella, Aglio and CCPS, alleging numerous violations of federal and state law. Defendants moved to dismiss, and the Court, in a previous order, dismissed all counts as to CCPS but allowed three claims to proceed into discovery against Aglio and Pascarella: (1) infringement of Savoy's Fourteenth Amendment due process rights in violation of 42 U.S.C. § 1983, (2) battery, and (3) false imprisonment. *See* Doc. No. 32. Pascarella and Aglio now move for summary judgment on the remaining claims, *see* Doc. Nos. 58, 63, and, for the reasons that follow, the Court will grant summary judgment as to Plaintiff's section 1983 claims and dismiss the state claims, without prejudice, for jurisdictional reasons.

## II. STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for

the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III. ANALYSIS

### A. Section 1983

Plaintiff asserts that both Pascarella and Aglio infringed on his constitutional rights of privacy and bodily security in violation of 42 U.S.C. § 1983. Actions of corporal punishment by a state school official "may give[] rise to an independent federal cause of action to vindicate substantive due process rights." *Hall v. Tawney,* 621 F.2d 607, 611 (4th Cir. 1980). It is not enough for a plaintiff to show that a school official committed an assault or battery as defined by state law: the threshold for finding a Fourteenth Amendment violation in the school context is "of [a] different . . . order of magnitude" than for state common-law claims. *Id.* at 613. The applicable test is "whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.*

Savoy's testimony recounts several instances of physical contact: (1) Aglio hitting him on the back of the head to wake him up in the R&R room, (2) Aglio loosely gripping his arm to direct him toward Pascarella's office, (3) Aglio pushing him forcefully into a wall, (4) Aglio and Pascarella carrying him from the hallway to Dr. Watson's office and forcing him to sit in a chair, and (5) Aglio throwing Savoy onto the chair with sufficient force to break it.

The first, second, and fourth contacts clearly cannot serve as the foundation for a *Hall* claim. Regarding the incident in the R&R room, there may have been better ways of waking Savoy up than whacking him on the back of the head. However, the record unambiguously reveals that Aglio's motivation for waking Savoy up was a legitimate concern that he did not belong in school that day because of his suspension. Furthermore, Savoy concedes that the force used by Aglio was not very painful: at worst, it slightly worsened his pre-existing headache. Similarly, Savoy does not allege that he suffered any pain when Aglio gripped his arm to direct him toward Pascarella's office or when Aglio and Pascarella carried him to Dr. Watson's office. It is apparent that both actions were motivated by a desire to maintain order in the classrooms and hallways of the school, not "malice or sadism" toward Savoy. *Id.*

Plaintiff has a somewhat stronger case for liability based on (3) and (5), but even those actions do not rise to the extreme level necessary to satisfy the stringent *Hall* test. An arguable case can be made that Aglio overreacted to Savoy's provocations, but not that Aglio's behavior was "so disproportionate to the need presented" that it "amounted to a brutal and inhumane abuse of official power." *Id.* This conclusion emerges with clarity when the facts here are compared with those in other cases arising under *Hall*. *See generally Brown* ex rel. *Brown v. Ramsey*, 121 F. Supp. 2d 911, 918-22 (E.D. Va. 2000) (helpfully collecting and summarizing case law across the country interpreting and applying *Hall*), *aff'd*, 10 F. App'x 131 (4th Cir. 2001) (per curiam).

These cases make clear that plaintiffs bear "a difficult burden . . . in order to survive summary judgment" on a *Hall* claim. *Id.* at 918. Courts have found no constitutional violation even in a number of situations "where seemingly harsh or unfair punishment resulting in actual physical injury occurred." *Id.* at 920; *see, e.g.*, *Saylor v. Bd. of Educ. of Harlan Cnty., Ky.*, 118

F.3d 507, 511, 514-15 (6th Cir. 1997) (finding no liability where teacher gave a student "five licks of [a] paddle], resulting in bruising and an emergency room visit, even though the court acknowledged that the paddling was "unwise excess" and the defendants themselves admitted that the force used was "excessive"); *Brooks v. Sch. Bd. of Richmond, Va.*, 569 F. Supp. 1534, 1536 (E.D. Va. 1983) ("[A]llegations of twenty licks with a two-foot-long paddle causing a severe hematoma and loss of the use of an arm for a week did not shock the conscience of the United States Supreme Court in *Ingraham* [*v. Wright*, 430 U.S. 651 (1977)].").

Constitutional liability is reserved for those rare situations in which the behavior of school officials is not merely disproportionate, but "so disproportionate" as to be "literally shocking to the conscience." *Hall*, 621 F.2d at 613. In *Hall*, the rigorous standard was satisfied by allegations that a teacher, "without apparent provocation," struck the plaintiff with a paddle made of hard, thick rubber, violently shoved her against a large desk, twisted her right arm, and paddled her yet again, resulting in her being admitted to a hospital emergency room for a ten-day course of treatment by medical specialists. *Id.* at 614 (quotation marks omitted). More recently, the Fourth Circuit upheld a *Hall* complaint alleging that a wrestling coach, "for no legitimate disciplinary purpose," inflicted "numerous" and "unprovoked" beatings on a student, resulting in "excruciating physical pain, inflammation of the body, and traumatic stress disorders which may be permanent." *Meeker v. Edmundson*, 415 F.3d 317, 321, 324 (4th Cir. 2005) (internal quotation marks omitted).

There is simply nothing in the case at bar comparable to the facts in *Hall* or *Meeker*. Here, the undisputed evidence suggests a clear rationale for each use of force by Aglio and Pascarella, with the possible exception of the minor, non-injurious incident in the R&R room. According to Savoy's deposition, when Aglio and Pascarella were conversing in the hallway to

determine whether Savoy belonged on the school premises, he jerked his arm out of Aglio's grip and began walking away from them toward the R&R room. Aglio allegedly responded by pushing Savoy against the wall (causing his head to hit the wall), at which point Savoy began crying and (soon thereafter) yelling and cursing. Aglio and Pascarella then carried Savoy to Dr. Watson's office and made him sit down. Savoy acknowledges that he resisted their efforts by attempting to stand up, and it was only then that Aglio threw him onto the chair, breaking it in the process.

Based on this evidence, a reasonable fact-finder might very well conclude that Aglio and Pascarella's restraint methods were excessive and unwise. However, there can be no genuine dispute that Aglio and Pascarella's actions were "good faith effort[s] to maintain or restore discipline," not "maliciously and sadistically [performed] for the very purpose of causing harm." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *overruled on other grounds by Graham v. Connor*, 490 U.S. 386 (1989). Consequently, Aglio and Pascarella are entitled to summary judgment on the remaining federal claims.

B. **Battery and False Imprisonment**

The Complaint based federal jurisdiction solely on the existence of federal questions pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, and supplemental jurisdiction under 28 U.S.C. § 1367(a) for the common-law claims. Because the Court has now granted summary judgment to Defendants on the only remaining federal claim, it is unnecessary to consider the merits of the state-law counts.[5] Instead, the Court will dismiss Plaintiff's battery and false-

---

[5] The Court reiterates that the legal standard for establishing a federal section 1983 claim against school officials is different from that of a state-law battery claim. *See Hall*, 621 F.2d at 613 ("Mindful that not every state law tort becomes a federally cognizable constitutional tort under § 1983 simply because it is committed by a state official, we do not find the substance of this right in the parallel right defined by state assault and battery law." (internal citations and quotation marks omitted)). Insofar as Plaintiff must show malice in order to recover on his state-law claims, the Court's holding that Aglio and Pascarella did not act with "malice or sadism" for purposes of section 1983 does not necessarily assure the non-existence of malice as defined by Maryland law. *See, e.g.*, *Shoemaker v.*

10

imprisonment claims without prejudice pursuant to section 1367(c)(3).  Consequently, Plaintiff will have a **thirty-day window of time** to re-file his common-law claims in the Maryland state court system, if he chooses to do so.  *See* § 1367(d).

## IV. CONCLUSION

For the reasons stated, the Court grants in part Defendants' motions for summary judgment, *see* Doc. Nos. 58, 63, and dismisses the remaining state-law claims without prejudice. A separate order will follow.

| | |
|---|---|
|   July 26, 2011 | /s/ |
| Date | Alexander Williams, Jr.<br>United States District Judge |

---

*Smith*, 725 A.2d 549, 559 (Md. 1999) ("The word 'malice' has been a troublesome one in the law, because it has been used in many different contexts and, as a result, has been defined in different ways.").